**54**

**CHRISTIAN DIOR–NEW YORK, INC., Plaintiff,**

v.

**KORET, INC., Defendant.**

**No. 85 Civ. 2645 (KTD).**

United States District Court, S.D. New York.

Oct. 8, 1985.

Windels, Marx, Davies & Ives, New York City, for plaintiff; Raymond T. Munsell, Todd B. Sollis, of counsel.

Spengler, Carlson, Gubar, Brodsky & Frischling, New York City, for defendant; William J. McSherry Jr., of counsel.

## MEMORANDUM & ORDER

KEVIN THOMAS DUFFY, District Judge.

Plaintiff, Christian Dior-New York, Inc. ("Dior"), moves for an order pursuant to Fed.R.Civ.P. 56 granting summary judgment and a permanent injunction enjoining defendant, Koret, Inc. ("Koret"), from infringing upon Dior's registered trademarks. Koret opposes Dior's motion and cross-moves pursuant to Fed.R.Civ.P. 60 requesting modification of the preliminary injunction order. For the reasons that follow, plaintiff's motion is granted.

On or about January 1, 1980, Dior and Koret entered into a license and distributorship agreement (the "Agreement"), which expired by its terms on December 31, 1984 without any option for renewal. Under the Agreement, Koret had the right to manufacture or have manufactured in the United States or Japan leather handbags and beaded bags for sale in the United States and the right to distribute (in the United States) Dior baggage made in France under the Dior name.

Although the Agreement provided that the license would expire on December 31, 1984, it gave Koret a three month grace period after that date to sell any remaining merchandise with a restriction that Koret not manufacture or have on hand more merchandise than it would reasonably expect to sell during that three month period.[1]

This court heard brief testimony from Dior on April 23, 1985 and entered a pre-

---

1. Paragraph 16 of the Agreement provides in part:

Upon expiration or termination of this agreement Licensee shall cease the manufacture of Dior articles but, except in the event of termination for breach, may continue to sell or offer for sale, only through prestigious channels ... for a period of three (3) months, all the Dior Articles set forth on the inventories referred to in subdivisions (1) and (2) of subparagraph (b) above ... (Finished goods, merchandise in process of manufacture and uncut piece goods).

\* \* \* \* \* \*

During the three month period immediately preceding the expiration of the term of this agreement (hereinafter "Final Quarter") Licensee shall not have in hand (a) an inventory of Dior Articles in excess of the inventory of such Articles which it possessed during the three month period immediately preceding said Final Quarter; or (b) an inventory of uncut piece goods or unfinished Dior Articles

liminary injunction prohibiting Koret from disposing of Dior merchandise. Koret has not denied that it used the trademarks after all its rights under the License expired. Koret, however, seeks to avoid summary judgment, pointing to the economic harm which it allegedly will suffer should a permanent injunction issue.

Although it has infringed Dior's trademarks, Koret contends that it should not be precluded from disposing of the inventory it has on hand, because Dior purportedly misled Koret into believing that Dior might change its mind and renew the License. Koret argues that it relied upon asserted promises by Dior in building up the inventory it now has on hand and, because of this, Dior should be estopped from preventing Koret from disposing of the merchandise.

From early 1983 until early 1985, Koret and Dior frequently communicated to each other in reference to the renewal of the Agreement. Koret maintains that Ms. Nicholas, the president of Dior-New York, repeatedly assured Koret in these correspondences that there would either be a License renewal or an extended sell-off period. Koret asserts that although Ms. Nicholas' promises were oral, they are confirmed in part by her letters to Koret. The record, however, reflects no such confirmation. Indeed, it establishes that Dior repeatedly informed Koret of Dior's intention not to renew the License unless new, mutually satisfactory terms could be agreed upon. In a letter to Koret dated April 11, 1983, Dior expressed its doubt as to the "continuation of the license after its expiration due to the unsatisfactory performance of Koret and major differences in styling and marketing philosophies." Plaintiff Dior's Exh. A at 1. Dior's expressed "intention in informing" Koret of "Dior's views regarding its future relationship with Koret" was "to provide Koret with sufficient time to phase out its Dior operations and pursue new opportunities prior to expiration of the license." *Id.* at 2.

In a letter dated May 4, 1983, Koret made several proposals to improve the working relationship between Dior and Koret. Dior responded by stating that Dior was willing to consider a number of proposals, and expressed a desire to meet with Koret in March of 1984 after the proposals had time to yield results. Again by letter, dated March 21, 1984, Dior contacted Koret in reference to the License Agreement. After citing to numerous areas of Koret's business operations over the 1983 period, Dior expressed its dissatisfaction with the results, and concluded "that we cannot agree at this time to a three-year renewal of our License Agreement dated January 1, 1980, which expires December 31, 1984."

Koret further contends that Dior-New York knew that Koret's inventory was normal in size for the industry and could not possibly be sold through normal channels of distribution in a three month period, especially given the seasonal nature of the merchandise. Koret maintains that its excessive inventory was directly attributable to Dior's request that Koret increase its inventory to anticipate sales that would be guaranteed by a 1,000,000 piece Dior advertising mailer. Koret also points to its investment of $400,000 in its license activities during 1983 and 1984, an additional $30,000 in a national sales promotion, and the ongoing License renewal negotiations as other examples of how Dior misled Koret into believing a renewal was forthcoming.

Defendant's arguments are unpersuasive. Paragraph 16 of the Agreement is very explicit. It restricted the amount of the inventory Koret could have on hand during the last quarter of 1984 and gave Koret a three month period to sell off that inventory. The intent of this provision, as expressly stated in the Agreement, was to prevent Koret from having a large inventory of Dior articles at the expiration of the Agreement.

and sell in accordance with the terms of this agreement during said Final Quarter. The intent of this provision is to prevent the Licensee's having a large inventory of Dior Articles at the expiration of this agreement, thereby facilitating the orderly disposition of Licensee's inventory thereof.

In effect Koret is asking this court to reform the Agreement it entered into with Dior so that Koret may be relieved of the economic burden it now experiences. However, Koret has given no adequate justification for such a reformation. Any action taken by Koret in complying with Dior's request to increase its inventory or its advertising can only be viewed as a unilateral act by Koret in the hope of renewal. Koret was provided with more than sufficient notice that a renewal of the Agreement was not probable. From the evidence on record, it cannot be said that any promise—whether expressed or implied—was made by Dior. Any adverse economic consequences Koret may suffer because of the substantial inventory remaining after the expiration of the Agreement can only be attributed to Koret's own actions.[2] Plaintiff's motion for summary judgment is granted and permanent injunction will enter.

Settle order on five (5) days' notice within fifteen (15) days of the date hereof.

SO ORDERED.

---

**2.** I should note that Koret asserts with no explanation that the trademark registration information which was submitted by plaintiff was defective on its face. Koret, however, cites to no specific defect, nor is there any readily apparent.